UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

KRISTEN L. LAPLANTE,      )
                         )
        Plaintiff,       )
                         )
    v.                   )        1:15-cv-00351-JAW
                         )
PEERLESS INSURANCE       )
COMPANY,                 )
                         )
        Defendant.       )

## SUMMARY JUDGMENT ORDER

The Plaintiff seeks to recover uninsured motorist benefits under her parents' motor vehicle policy with the Defendant for injuries she sustained in a motorcycle accident. Under the terms of that policy, uninsured motorist benefits are available to the Plaintiff's parents as named insureds and their family members who are residents of their household. As a matter of law, the Court concludes that, even viewing the evidence in the light most favorable to the Plaintiff, she was not a resident of her parents' household at the time of the accident, and therefore, the Court grants the Defendant's motion for summary judgment.

## I.    PROCEDURAL HISTORY

On August 26, 2015, Kristen L. LaPlante filed a complaint against Peerless Insurance Company (Peerless). *Compl.* (ECF No. 1). The Complaint contains two counts: Count I seeks a declaratory judgment that Ms. LaPlante was covered under her parents' motor vehicle insurance policy, and Count II alleges that Peerless

breached that insurance policy by refusing to pay Ms. LaPlante following the accident. *Compl.* at 2–3. Peerless answered the Complaint on October 7, 2015. *Answer* (ECF No. 5).

On July 20, 2016, the United States Magistrate Judge held a telephone conference in which he ordered the parties to complete discovery only as to the coverage issue by October 14, 2016. *Report of Telephone Conf. and Order* at 1 (ECF No. 39). On October 25, 2016, following the completion of discovery on the coverage issue, the Magistrate Judge held another telephone conference and determined that "judicial economy militates in favor of resolving the coverage issue before the parties engage in further discovery regarding Plaintiff's liability and damage claims." *Report of Telephone Conference and Order* at 1 (ECF No. 42). The Magistrate Judge noted that Peerless intended to file a motion for summary judgment on the issue of coverage and concluded that no Local Rule 56(h) conference was needed "[g]iven the relative narrow issue and the limited summary judgment record that will be necessary . . . ." *Id.* at 1.

On December 15, 2016, Peerless filed a motion for summary judgment and a statement of undisputed material facts. *Mot. for Summ. J.* (ECF No. 43) (*Def.'s Mot.*); *Def.'s Statement of Undisputed Material Facts* (ECF No. 44) (DSMF). On February 6, 2017, Ms. LaPlante filed an opposition to Peerless' motion for summary judgment and a responsive statement of material facts. *Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J.* (ECF No. 48) (*Pl.'s Opp'n*); *Pl.'s Opposing Statement of Material Facts Pursuant to D. Me. Loc. R. 56(c)* (ECF No. 49) (PRDSMF). Ms. LaPlante did not file

a statement of additional material facts.  On March 6, 2017, Peerless filed a reply and a reply statement of undisputed material facts.[1]  *Reply in Supp. of Mot. for Summ. J.* (ECF No. 52) (*Def.'s Reply*); *Def's Reply Statement of Undisputed Material Facts* (ECF No. 53).

## II.     SUMMARY JUDGMENT FACTS[2]

### A.     Accident and Insurance Policy

Ms. LaPlante was injured in a motor vehicle accident (Accident) on January 28, 2010, in Orlando, Florida, when she was the passenger on a motorcycle owned and negligently operated by an uninsured driver.  DSMF ¶ 1; PRDSMF ¶ 1.

At the time of the Accident, Ms. LaPlante's parents, Michael and Robin LaPlante of Waterville, Maine, were the only named insureds on a personal motor vehicle insurance policy (Policy) issued by Peerless.  DSMF ¶ 2; PRDSMF ¶ 2.  In relevant part, the Policy provided uninsured motorists coverage to the named insureds and to "any 'family member'."  DSMF ¶ 3; PRDSMF ¶ 3.  The Policy defines "family member" as "a person related to you by blood, marriage or adoption who is a

---

[1]     Under the Local Rules, a party may only file a reply statement of facts if the party opposing summary judgment has filed a statement of additional material facts.  *See* D. ME. LOC. R. 56(d) ("A party replying to the opposition to a motion for summary judgment shall submit with its reply a separate, short, and concise statement of material facts which shall be limited to any additional facts submitted by the opposing party").  Here, Ms. LaPlante, as the party opposing summary judgment, did not file a statement of additional material facts.  Thus, according to the Local Rules, Peerless was not entitled to file a reply statement of facts.  Accordingly, the Court will disregard Peerless' reply statement of facts and rely simply on Peerless' initial statement of material facts and Ms. LaPlante's opposing statement of material facts.

[2]     In keeping with "the conventional summary judgment praxis," the Court recounts the facts in the light most hospitable to nonmovant's case theories consistent with record support.  *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002) (citing *C.K. Smith & Co. v. Motiva Enters.*, 269 F.3d 70, 72 (1st Cir. 2001)).

resident of your household. This includes a ward or foster child."[3]  DSMF ¶ 4; PRDSMF ¶ 4.

## B.     Where Ms. LaPlante Lived and When[4]

### 1.     2000 – October 2002

After graduating high school in 2000, Ms. LaPlante moved from Waterville, Maine, to southern Maine, where she attended college in Gorham until partway through her sophomore year, living variously in dorms or with her sister until the spring of 2002.[5]  DSMF ¶ 6; PRDSMF ¶ 6.  Upon leaving college in the spring of 2002, Ms. LaPlante lived with friends in a house in Portland, Maine.  *Id.*

### 2.     October 2002 – September 2003

In October 2002, Ms. LaPlante moved back to Waterville and lived with her father in an apartment while her mother was working in North Carolina.[6]  DSMF ¶

---

[3]      The uninsured provision of the personal auto policy requires Peerless to pay compensatory damages which an "insured" is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injury sustained by an insured.  *See* DSMF, Attach. 1 at 99, *Personal Auto Policy* (*Uninsured Motorists Coverage – Maine*, *Insuring Agreement* Part C (A)(1)) (ECF No. 44).  This portion of the policy defines "insured" to include "family member."  *Id.* (B)(1).  The policy defines "family member" as "a person related to you by blood, marriage or adoption who is a resident of your household."  *Id.* at 81 (*Definitions* (F)).  The policy defines "you" to include "named insured."  *Id.* (*Definitions* (A)(1)).  Kristen LaPlante is Michael and Robin LaPlante's daughter and therefore fits within the first part of the policy's definition of "family member" since she is "a person related to you by blood, marriage or adoption."  To establish coverage under the uninsured portion of the policy, the remaining question, and the one the parties dispute, is whether Kristen LaPlante was a resident of the LaPlante's household at the time of the Accident.

[4]      In its statement of material facts, Peerless provides a rough timeline of where Ms. LaPlante lived and when.  In this Order, the Court adopts this sequential framework.  Occasionally, and only when a fact does not appear to be in contention, the Court has inserted details from Ms. LaPlante's deposition to provide greater context to this timeline.  The Court will make clear in the footnotes when it has inserted a detail for context.

[5]      To provide greater context and as it does not appear to be a fact in contention, the Court amends the statement to clarify that upon leaving college in the spring of 2002, Ms. LaPlante lived with friends in a house in Portland, Maine. *See* DSMF, Attach. 2, *Dep. of Kristen L. LaPlante* 30:6–9 (ECF No. 44) (*LaPlante Dep.*).

[6]      Peerless proposes, "[D]uring those first years after leaving college, Plaintiff did stay for some months with her father in an apartment in Waterville in 2003 or 2004 while her mother was living

8; PRDSMF ¶ 8. Also in October 2002, Ms. LaPlante began working at an Old Navy store in Augusta, Maine. PRDSMF ¶ 5. Her employment with Old Navy continued until September 2003.[7] *Id.*. At some point during the period from October 2002 to September 2003, Ms. LaPlante transferred from the Old Navy in Augusta to an Old Navy in Portland. *Id.*. Upon her transfer, Ms. LaPlante moved to Scarborough, Maine.[8] *Id.* Ms. LaPlante does not know precisely when the transfer occurred, but she believes that she lived for a longer period with her father in Waterville than she did in Scarborough. *Id.*

Also during this time period, Ms. LaPlante stayed with her mother in North Carolina for "a couple of months," but Ms. LaPlante cannot recall the exact dates.[9] DSMF ¶ 8; PRDSMF ¶ 8.

---

and working in North Carolina." DSMF ¶ 8. Ms. LaPlante denies the statement, but offers no explanation beyond a citation to her deposition. PRDSMF ¶ 8 (citing *LaPlante Dep.* 129:12–130:22). This cited portion of the record is not responsive to Peerless' statement and is likely the result of a typo. However, the Court nevertheless amends Peerless' statement because it is not supported by the record and is likely the result of a typo as well. The portion of the record that Peerless cites makes clear that Ms. LaPlante moved into her father's apartment in Waterville in 2002, not 2003 or 2004. *See LaPlante Dep.* 30:10–17. The Court amends the statement accordingly.

[7] Peerless proposes in part, "Plaintiff . . . had scarcely stayed overnight with her parents in the decade since she graduated high school in 2000, other than a few occasions when she stayed with them for a few months." DSMF ¶ 5. Ms. LaPlante interposes a qualification that provides additional details regarding the "few months" when she stayed with her parents. PRDSMF ¶ 5. In particular, she details her employment with Old Navy in Augusta, Maine, and explains that she lived with her father while working in Augusta. *Id.* The qualification finds support in the record and provides useful context. *See LaPlante Dep.* 33:17–21, 34:8–17; 35:9–22. Therefore, the Court accepts the qualification.

[8] To provide greater context and as it does not appear to be a fact in contention, the Court amends the statement to clarify that upon her transfer to the store in Portland, Ms. LaPlante moved to Scarborough, Maine. *LaPlante Dep.* 35:9–12.

[9] Peerless proposes in part, "Plaintiff also stayed for a while with her mother in North Carolina during [2003 or 2004], but she cannot recall when or for how long." DSMF ¶ 8. Ms. LaPlante denies the statement, but offers no explanation other than a citation to her deposition. PRDSMF ¶ 8 (citing *LaPlante Dep.* 129:12–130:22). However, this cited portion of Ms. LaPlante's deposition is inapposite and is likely the result of a typo. Nevertheless, the Court amends Peerless' statement to more closely align with the record. *See LaPlante Dep.* 15:4–8 (explaining that Ms. LaPlante lived with her mother in North Carolina for a "couple of months").

### 3. September 2003 – Fall 2004

Ms. LaPlante left Scarborough and continued living independently in various locations in Maine until the fall of 2004.[10]  DSMF ¶ 7; PRDSMF ¶ 7.  Postal records indicate that she moved from Scarborough to Bangor in September 2003, from Bangor to Orrington in November 2003, and from Orrington to Milford in August 2004.  *Id.*

When Ms. LaPlante lived in Bangor, she was involved in a motor vehicle accident while driving her parents' car.[11]  DSMF ¶ 9; PRDSMF ¶ 9.  Following that accident and through January 28, 2010, Ms. LaPlante's parents did not permit her to drive their cars.[12]  DSMF ¶ 9; PRDSMF ¶ 9.  Ms. LaPlante has no specific recollection

---

[10]    To provide greater context and as it does not appear to be a fact in contention, the Court amends the statement to clarify that during this period, Ms. LaPlante lived in Scarborough, Bangor, Orrington, and Milford. DSMF, Attach. 4, *United States Postal Service 2003–2004 Change of Address Forms* at 1–3 (ECF No. 44); *LaPlante Dep.* 19:19–20:2, 35:23–36:20.

[11]    To provide greater context and as it does not appear to be a fact in contention, the Court amends the statement to clarify that this accident occurred while Ms. LaPlante lived in Bangor. *LaPlante Dep.* 128:22–23, :130:13–19.

[12]    Peerless proposes, "After Plaintiff left college and after she was involved as a driver in a motor vehicle accident in 2003, her parents stopped allowing her to drive their cars."  DSMF ¶ 11 (citing *LaPlante Dep.* 128:5–133:11).  Ms. LaPlante denies the statement but provides no explanation beyond a citation to her deposition.  PRDSMF ¶ 11 (citing *LaPlante Dep.* 129:12–130:22).

Reviewing the cited portions of the deposition, the Court observes that the evidence in support of this paragraph is confusing  in part due to Ms. LaPlante's lack of precision.  At the same time, the Court concludes that Ms. LaPlante was technically correct in denying Peerless' statement of material fact as phrased, because it is open-ended as to time.  The Court amended the statement to reflect the actual support for the proposition in the underlying record.

In her deposition, Ms. LaPlante acknowledged that she was involved in an automobile accident after she left college in September or October 2003.  *LaPlante Dep.* 128:5–129:7.  Ms. LaPlante was asked and answered:

Q. Did [your parents] continue to let you drive their cars after that accident?
A. No.

*Id.* 128:19–21.  This supports Peerless' statement that after the September–October 2003 accident, Ms. LaPlante's parents did not allow her to drive their cars.  Later in the deposition, Ms. LaPlante broadened this testimony:  "They always just only said we don't want you driving our cars."  *Id.* 134:24–135:2.

However, further in her deposition, Ms. LaPlante went on to describe two occasions when her parents allowed her to operate their vehicles.  One occurred when her father could not drive because his eyes were dilated at the eye doctor's.  *Id.* 129:22–130:1.  A second was when there was an emergency at her house and they called 911.  *Id.* 130:1–5.  Ms. LaPlante had to drive her mother to the hospital following the ambulance.  *Id.*  Ms. LaPlante later confirmed that the first incident, the eye doctor trip, took place after the January 28, 2010 Orlando accident, which is the subject of this case.  *Id.* 131:10–

of driving her parents' vehicles between the time of the accident in 2003 and the Accident at issue in this case.[13]  DSMF ¶ 10; PRDSMF ¶ 10.

While still living in Bangor, Ms. LaPlante bought a Chevrolet and purchased her own insurance policy for the car, which she maintained until she moved to Florida in the fall of 2004.[14]  DSMF ¶ 11; PRDSMF ¶ 11.

### 4.  Fall 2004 – May 2006

Ms. LaPlante moved to Florida for the first time in the fall of 2004, and in November 2004, she registered a change of address with the United States Postal Service from Milford, Maine, to Daytona Beach, Florida.  DSMF ¶ 12; PRDSMF ¶ 12. She changed her address again in February 2004 from Daytona Beach to Orlando, Florida.  DSMF ¶ 12; PRDSMF ¶ 12.  Ms. LaPlante lived and worked in Florida for about a year and a half between 2004 and 2006, during which time she did not visit

---

15.  The date of the 911 call incident is obscure, but Ms. LaPlante acknowledged that it is possible it took place before the accident in Bangor in September or October 2003.  *Id.* 131:16–132:8.

Putting this together, the Court concludes that Ms. LaPlante's parents did not want her to drive their vehicles from September–October 2003 through January 28, 2010.  The Court amends Peerless' statement of material fact paragraph nine accordingly.

13  Ms. LaPlante interposes a qualification, but offers no explanation beyond a citation to her deposition.  PRDSMF ¶ 10 (citing *LaPlante Dep.* 130:13–22).  In the cited portion of her deposition, Ms. LaPlante testifies that after her accident in 2003, her parents owned a Bonneville that she drove "more than once," but critically, she cannot recall when that occurred.  *See LaPlante Dep.* 130:18–19. Furthermore, Peerless' statement that Ms. LaPlante has "no specific recollection of driving her parents' vehicles" between the time of the accident in 2003 and the Accident in this case is supported by the record.  *See id.* 133:7–11 ("Q: . . . In between those dates, the Bangor accident and the [Accident], can you state with certainty that you drove your parents' cars at all?  A: I don't recall.  I don't know.").  Therefore, the Court rejects Ms. LaPlante's qualification.

14  Peerless proposes, "In the fall of 2003, Plaintiff purchased the only car she ever owned prior to the Accident, and she purchased her own insurance policy for that car . . . ."  DSMF ¶ 11 (citing *LaPlante Dep.* 135:11–136:13).  Ms. LaPlante denies the statement, pointing out that the cited portion of her deposition reads, "[i]t's the only other car that I've owned *besides the other one.*"  PRDSMF ¶ 11 (emphasis in PRDSMF).  It strikes the Court that Peerless is not offering the statement to prove that the Chevrolet was the only car that Ms. LaPlante owned, but rather to prove that Ms. LaPlante purchased her own motor vehicle insurance for the Chevrolet.  Nevertheless, out of an abundance of deference to Ms. LaPlante, the Court amends the statement to remove the assertion that the Chevrolet was "the only car she ever owned prior to the Accident."

her parents nor did they visit her, and Ms. LaPlante had little contact with her parents by phone or email. DSMF ¶ 13; PRDSMF ¶ 13. While Ms. LaPlante was in Florida, her parents moved several times within Maine, and she was not always aware of their current address, nor were they aware of hers at all times. DSMF ¶ 14; PRDSMF ¶ 14.

### 5. May 2006 – April 2007

Ms. LaPlante returned to Maine in May 2006. DSMF ¶ 15; PRDSMF ¶ 15. Her father drove her from the airport directly to her sister's home in Portland, where she lived for a few months until moving in with friends in Biddeford, Maine.[15] DSMF ¶ 16; PRDSMF ¶ 16. While staying at her sister's home, her father visited frequently, but her mother did not. PRDSMF ¶ 16. She also visited her parents' home at some point when her sister moved back in with her parents. *Id.* Ms. LaPlante listed the Biddeford address on her 2006 tax return. DSMF ¶ 17; PRDSMF ¶ 17.

### 6. April 2007 – February 2009

In April 2007, Ms. LaPlante moved from Biddeford to California, and her address on her 2007 tax return was in Avalon, California. DSMF ¶ 18; PRDSMF ¶

---

[15] Peerless proposes, "[Ms. LaPlante] did not even visit her parents' home on her return to Maine, going from the airport directly to her sister's home in Portland, where she lived for a few months until moving in with friends in Biddeford, Maine." DSMF ¶ 16 (citing *LaPlante Dep.* 46, 53, 57). Ms. LaPlante qualifies the statement, asserting, "Plaintiff's father picked her up at the airport and drove her to her sister's place where she stayed until moving to Biddeford when she obtained a job there. Her father visited frequently but her mother did not. She also visited her parents' home when her sister moved back in with her parents." PRDSMF ¶ 16 (citing *LaPlante Dep.* 54:3–88:16).

As an initial matter, Peerless' motion for summary judgment addresses whether Ms. LaPlante resided with her parents for purposes of the insurance contract. Thus, it is only marginally relevant that her father picked her up at the airport, or that her father, but not her mother, visited her at her sister's home. Nevertheless, Ms. LaPlante's qualification has support in the record, *see LaPlante Dep.* 54:2–55:23, and out of an abundance of deference to Ms. LaPlante, the Court amends the statements to include these details.

18.    Ms. LaPlante had secured a three-month seasonal job prior to moving to California.    DSMF ¶ 19; PRDSMF ¶ 19.    Once there, she found subsequent employment and remained in California at various locations for almost two years.  *Id.* During the time she lived in California, Ms. LaPlante did not leave the state, nor did her parents visit her there.    DSMF ¶ 20; PRDSMF ¶ 20.    While in California, Ms. LaPlante contacted her parents by telephone.[16]    DSMF ¶ 21; PRDSMF ¶ 21.

### 7.    February 2009 – May 2009

Ms. LaPlante moved back to Maine in February 2009, intending to live with her parents.[17]  DSMF ¶ 22; PRDSMF ¶ 22.  Ms. LaPlante brought with her a cat that she acquired in California.  *Id.*  Her father picked up Ms. LaPlante and her cat at the airport and took them to her parents' home in Oakland, Maine; this was the first time Ms. LaPlante had visited her parents' home in Oakland since they purchased it in 2007.[18]  DSMF ¶ 22; PRDSMF ¶ 22.

---

[16]    Peerless proposes, "While she was in California, Plaintiff had only limited contact with her parents."  DSMF ¶ 21.  The Plaintiff denies the statement, asserting that "Plaintiff called frequently." PRDSMF ¶ 21.  Both assertions find support in the record.  *See LaPlante Dep.* 69:23–25 (Q: So you had very limited phone contact with your parents while you were in California?  A: Same as always [i.e., yes]"); *but see LaPlante Dep.* 70:19–71:5) (explaining that she got in trouble at work when her employer noticed calls to Ms. LaPlante's parents on the phone bill); DSMF, Attach. 4, *Dep. of Robin LaPlante* 7:1–15 (ECF No. 44) (*Robin LaPlante Dep.*) (indicating that Ms. LaPlante began calling "non-stop" in the middle of the night).  Viewing the facts in the light most favorable to Ms. LaPlante, the Court amends the statement to indicate that while Ms. LaPlante was in California, she contacted her parents by telephone.

[17]    Peerless proposes, "When she moved back to Maine in February 2009, Plaintiff brought with her a cat she had acquired in California and visited her parents for the first time at the home they had purchased in 2007."  DSMF ¶ 22.  Ms. LaPlante qualifies the statement, asserting, "Plaintiff intended to live with her parents."  PRDSMF ¶ 22 (citing *LaPlante Dep.* 73:5–17).  Ms. LaPlante's qualification finds support in the record.  *See LaPlante Dep.* 73:15–17 ("Q: In February 2009 when you came from California to Maine, what was your plan?  A: To live with my parents.").  The Court amends the statement accordingly.

[18]    To provide greater context and as it does not appear to be a fact in contention, the Court amends the statement to clarify that her parents' home was located in Oakland, Maine, at the time. *LaPlante Dep.* 73:5–10.

Ms. LaPlante stayed with her parents for a few months after returning to Maine, but her parents expected her to "[g]et a job and get a life."[19] DSMF ¶ 23; PRDSMF ¶ 23. Ms. LaPlante's mother, troubled by her perception that Ms. LaPlante was an alcoholic, made it clear that Ms. LaPlante's stay at her parents' home would be temporary.[20] DSMF ¶ 24.

### 8.  May 2009 – October 2009

In May 2009, Ms. LaPlante found employment in Bar Harbor, Maine, and moved to an apartment there with her cat. DSMF ¶ 25; PRDSMF ¶ 25. Her father took Ms. LaPlante shopping and bought her pots, pans, dishes, and cutlery to set up her apartment in Bar Harbor.[21] DSMF ¶ 26; PRDSMF ¶ 26.

On April 15, 2009, while living in Bar Harbor, Ms. LaPlante visited the emergency room at Mount Desert Island Hospital. DSMF ¶ 27; PRDSMF ¶ 27. The

---

[19]     Peerless proposes, "Plaintiff stayed with her parents for a few months after returning to Maine, a situation in which she said her parents expected her to "[g]et a job and get a life." DSMF ¶ 23 (citing *LaPlante Dep.* 75). Ms. LaPlante qualifies this statement, arguing that "Defendant's citation to the deposition of Plaintiff says nothing about "[g]et a job and get a life." Ms. LaPlante is mistaken. *See LaPlante Dep.* 75:3–4 ("[My parents] just told me to find a job. Get a job and get a life is pretty much how they put it"). The Court rejects Ms. LaPlante's qualification.

[20]     Ms. LaPlante interposes a qualification, asserting, "Plaintiff's mother simply testified that she and her daughter did not get along that well so she (her daughter) was told it could not be a permanent thing." PRDSMF ¶ 24. The record does not bear out Ms. LaPlante's qualification; rather, Peerless' proposed statement finds ample record support. *See Robin LaPlante Dep.* 5:21–22 ("She's come home to stay, but not to live with us"); *id.* 6:5–11 ("So sometimes she'd get in trouble and she would have to come home and we would just let her stay, but I couldn't—she's an alcoholic and I have trouble living with her and so her and I don't get along that well so she was told that it couldn't be a permanent thing because I—I couldn't have her there"); *id.* 7:23–8:1 ("When she came back from California we couldn't—I—I talked to her and told her this can't be permanent, you need to get a job, you need to get a place to live). Therefore, the Court rejects Ms. LaPlante's qualification.

[21]     Peerless proposes, "Plaintiff's parents helped her move to Bar Harbor and purchased cookware, dishware and other household essentials for her to set up housekeeping in Bar Harbor." DSMF ¶ 26. Ms. LaPlante objects to the wording of Peerless' statement, asserting, "Plaintiff's father only bought some pots, pans, plates and silverware." PRDSMF ¶ 26 (citing *LaPlante Dep.* 82:20–21). The Court amends the statement to hue more closely to the record.

emergency room report associated with that visit states, "This is a 26-year-old resident of Bar Harbor . . . ."[22]  *Id.*

### 9.  October 2009 – January 2010

In October 2009, Ms. LaPlante moved from Bar Harbor back to Florida, taking her cat with her.  DSMF ¶ 28; PRDSMF ¶ 28.  Explaining her move from Bar Harbor to Florida, Ms. LaPlante testified that a friend "said she wanted to go down to Florida and I was like I don't want to be here in the winter, maybe I'll go too and we ended up just winging it and going."  PRDSMF ¶ 35.  Her parents understood Ms. LaPlante's move to Florida to be permanent.  DSMF ¶ 29; PRDSMF ¶ 29.  She drove to Florida with her friend and after arriving, stayed with that friend for a couple of days.[23]  PRDSMF ¶ 28.  However, after a couple of  days of living with her friend, she called one of her former roommates who lived in Davenport, Florida, and moved in with him instead.[24]  PRDSMF ¶ 28.  In November 2009, Ms. LaPlante registered an address

---

[22]    Peerless proposes, "While living in Bar Harbor, Plaintiff described herself as a 'resident of Bar Harbor' while receiving medical treatment at MDI Hospital there."  DSMF ¶ 27 (citing DSMF, Attach. 9, *Emergency Room Rep.* at 1 (ECF No. 44) (*ER Report*)).  Ms. LaPlante denies the statement, pointing out that the emergency room report only states that "[t]his is a 26-year-old resident of Bar Harbor coming in at 10:10 via private vehicle . . . ."  PRDSMF ¶ 27 (citing *ER Report* at 1).  According to Ms. LaPlante, the report does not state whether she described herself as a resident of Bar Harbor, whether the description was taken from some document, or whether the person preparing the record used the term because Ms. LaPlante was staying in Bar Harbor at the time.  PRDSMF ¶ 27.  Drawing all inferences in favor of Ms. LaPlante, the Court accepts the qualification.  The Court amends the statement to reflect the actual wording of the emergency room report.

[23]    Peerless proposes, "In October 2009, Plaintiff moved from Bar Harbor back to Florida, taking her cat with her, and in November 2009 she found a job at a restaurant in Florida and she registered an address change with the U.S. Postal Service from Bar Harbor, Maine to Davenport, Florida."  DSMF ¶ 28.  Ms. LaPlante qualifies the statement, inserting a number of additional details to present a more complete picture of her initial months in Florida.  PRDSMF ¶ 28.  These additional details are supported by the record, and the Court includes them to provide a more coherent narrative.

[24]    To provide greater context and as it does not appear to be a fact in contention, the Court amends the statement to clarify that her former roommate lived in Davenport, Florida, at the time.  *See LaPlante Dep.* 86:19–87:5.

change with the United States Postal Service from Bar Harbor, Maine, to her roommate's address in Davenport, Florida. DSMF ¶ 28; PRDSMF ¶ 28.

In November 2009, Ms. LaPlante obtained employment at a restaurant in Orlando.[25] DSMF ¶ 28; PRDSMF 28. At some point prior to the end of 2009, she moved into an apartment in Kissimmee, Florida, with five female co-workers in order to be closer to work.[26] DSMF ¶ 30; PRDSMF ¶ 28. She notified her parents of the move and reported the Kissimmee address as her home address on her 2009 tax return.[27] DSMF ¶ 30; PRDSMF ¶ 30.

On January 27, 2010, the day before the Accident, Ms. LaPlante moved from Kissimmee to Orlando and registered her Orlando address with the United States Postal Service. DSMF ¶¶ 31, 33; PRDSMF ¶¶ 31, 33. She moved to Orlando to get away from the group with whom she was living in Kissimmee and to have a quieter

---

[25]     To provide greater context and as it does not appear to be a fact in contention, the Court amends the statement to clarify that the restaurant was located in Orlando, Florida. *See LaPlante Dep.*, Ex. 1, *Employment History* at 147.

[26]     To provide greater context and as it does not appear to be a fact in contention, the Court amends the statement to clarify she moved to Kissimmee, Florida, at some point prior to the end of 2009. *See LaPlante Dep.* 87:18–88:1.

[27]     In its proposed statement, Peerless asserts that "[Ms. LaPlante] did not inform her parents of [the address change from Davenport to Kissimmee]." DSMF ¶ 30. Ms. LaPlante qualifies the statement, arguing that she "testified that she believed she did notify her parents of the address change from Davenport to Kissimmee." PRDSMF ¶ 30. Ms. LaPlante's qualification—which the Court construes as a denial—finds record support. *See LaPlante Dep.* 89:11–13. Therefore, the Court amends that statement to clarify that Ms. LaPlante notified her parents of the move from Davenport to Kissimmee.

living environment.[28]  PRDSMF ¶ 32.  Her parents were not aware of Ms. LaPlante's move to Orlando.[29]  DSMF ¶ 33; PRDSMF ¶ 33.

Between Ms. LaPlante's move to Florida in October 2009 and the Accident in January 2010, she did not return to Maine.  DSMF ¶ 34; PRDSMF ¶ 34.  According to Ms. LaPlante, before the Accident, she was going to try to stay in Florida to live and work there.[30]  DSMF ¶ 35; PRDSMF ¶ 35.

### 10.  January 2010 – June 2010

The Accident occurred on January 28, 2010, while Ms. LaPlante was travelling as the passenger on a motorcycle.  DSMF ¶¶ 36–37; PRDSMF ¶¶ 36–37.  Ms.

---

[28]    Peerless proposes, "Once [in Orlando], [Ms. LaPlante] moved into a shared rental that was more convenient to her employment."  DSMF ¶ 32 (citing *LaPlante Dep.* 88–89).  Ms. LaPlante qualifies the statement, clarifying that she moved from Davenport to Kissimmee because it was more convenient to her employment, but that she moved from Kissimmee to Orlando to get away from the group of women she lived with in Kissimmee and to have a quieter living environment.  The record supports Ms. LaPlante's qualification, and the Court amends the statement accordingly.  *See LaPlante Dep.* 88:9–17.

[29]    In its proposed statement, Peerless asserts that "[Ms. LaPlante] did not inform her parents of her new address [in Orlando]."  DSMF ¶ 33.  Ms. LaPlante qualifies the statement, asserting that "[t]here is no evidence . . . that Plaintiff did not notify her parents of the move to Orlando."  PRDSMF ¶ 33.  On the contrary, Ms. LaPlante testified that her parents did not know of her move to Orlando.  *See LaPlante Dep.* 90:4–8.  The Court rejects Ms. LaPlante's qualification.

[30]    Peerless proposes, "As of the date of the Accident, having established employment and a place to live in Orlando, Florida, Plaintiff intended to continue to live and work in Florida indefinitely, consistent with her parents' understanding that Plaintiff intended the move to Florida to be permanent."  DSMF ¶ 35 (citing, *inter alia*, *LaPlante Dep.* 92–93).  Ms. LaPlante denies the statement, arguing that Peerless' proposed statement mischaracterizes her testimony and that she never testified that she intended to stay in Florida "indefinitely."  PRDSMF ¶ 35 (citing *LaPlante Dep.* 92:24–93:3).  Moreover, Ms. LaPlante asserts that she testified that she decided to go to Florida because she did not want to be in Maine in the winter and that Peerless has not offered any evidence that her stay in Florida was intended to be permanent.  *Id.* (citing *LaPlante Dep.* 81:11–17).

Drawing all inferences in favor of Ms. LaPlante, the Court concludes that Ms. LaPlante's testimony does not support Peerless' assertion that she "intended to continue to live and work in Florida indefinitely . . . ."  DSMF ¶ 35.  The Court amends the statement to track Ms. LaPlante's testimony as closely as possible.  *See LaPlante Dep.* 92:24–93:3 ("Q: Before your accident you had just settled into a new living situation with Ryan in Orlando and you had a job and you planned to stay in Florida and work and live there?  A. I was going to try.").

LaPlante and the driver of the motorcycle had been dating since around Christmas of the previous year.  DSMF ¶ 36; PRDSMF ¶ 36.

Following the accident, Ms. LaPlante moved to Madeira Beach, Florida, in March 2010.[31]  DSMF ¶ 37; PRDSMF ¶ 37.  In Madeira Beach, Ms. LaPlante signed a one-year lease on her own apartment, paid a security deposit, and purchased some essentials for the apartment, including a bed and bedding, one or two pots and pans, dishes, and silverware.[32]  DSMF ¶ 38; PRDSMF ¶38.

After the Accident, Ms. LaPlante had no contact with her parents until March 2010, and she did not inform her parents of the Accident until June 2010.  DSMF ¶ 39; PRDSMF ¶ 39.  Plaintiff continued living in Florida after the Accident until approximately June 2010, when she relocated to Maine.[33]  DSMF ¶ 40; PRDSMF ¶ 40.

---

[31]    Peerless proposes, "After the Accident on January 28, 2010, Plaintiff moved to Madeira Beach, Florida, again without informing her parents of the address change.  DSMF ¶ 37 (*LaPlante Dep.* 91, 102–03).  Ms. LaPlante qualifies the statement, clarifying that Ms. LaPlante did not move to Madeira Beach until March.  PRDSMF ¶ 37 (citing *LaPlante Dep.* 90:19–91:10).  The record supports the qualification, and the Court amends the statement accordingly.  *See LaPlante Dep.* 90:12–14.

Ms. LaPlante also disputes Peerless' assertion that she did not inform her parents of the address change.  PRDSMF ¶ 37.  Upon review, the Court concludes that Peerless' record citation does not support the claim that Ms. LaPlante failed to inform her parents of her move to Madeira Beach, and therefore, the Court omits that portion of the statement.

[32]    In its proposed statement, Peerless asserts that Ms. LaPlante "purchased the necessities to set up a home."  DSMF ¶ 38.  Ms. LaPlante qualifies the statement, contending that she purchased the very bare minimums to live in the apartment.  PRDSMF ¶ 38.  In her deposition, Ms. LaPlante testifies about her purchases.  The Court amends the statement to track Ms. LaPlante's testimony.  *See LaPlante Dep.* 103:21–104:23.

[33]    Peerless proposes, "Plaintiff continued living in Florida after the Accident until the fall of 2010, when she relocated to Maine."  DSMF ¶ 40 (citing *LaPlante Dep.* 92).  Ms. LaPlante denies the statement.  PRDSMF ¶ 40 (citing *LaPlante Dep.* 92:14–16).  The record supports Ms. LaPlante's denial.  *See LaPlante Dep.* 92:14–19 (Q: So in June 2010, you told your father you wanted to move from Florida to Maine?  A: Yes.  Q: And he provided a ticket?  A: Yes.  And he also paid to ship all of my stuff back).  Accordingly, the Court amends the statement to reflect that Ms. LaPlante relocated to Maine in approximately June 2010.

## 11. Summary

Between her high school graduation and the Accident, Ms. LaPlante says that she did not live with either or both of her parents for an extended period other than the 2002–2003 stay with her father; as recorded by her medical provider in 2012, "She moved out of her mother's house at the age of 18."[34],[35]  DSMF ¶ 42; PRDSMF ¶ 42. Since she ended the stay with her father in approximately 2003, Ms. LaPlante has

---

[34]     In DSMF ¶ 42, Peerless states that Ms. LaPlante "'[b]etween high school graduation and the Accident, Plaintiff says she did not live with either or both of her parents for an extended period other than the 2003-2004 stay with her father." This appears to be a typo, and Peerless likely intended 2002–2003. Indeed, in DSMF ¶ 43, Peerless states that the stay with her father ended "in approximately 2003."

[35]     Peerless also proposes, "Plaintiff acknowledges that her parents, particularly her mother, have made clear to her since high school that they expect her to live on her own and support herself." DSMF ¶ 41 (citing *LaPlante Dep.* 137). Ms. LaPlante denies the statement, pointing out that during her deposition, she denied that she understood that she was not welcome to move back in with her parents. PRDSMF ¶ 41 (citing *LaPlante Dep.* 137:26–138:9, 138:16–18).

Ms. LaPlante's testimony on this issue is confusing. At first, she appears to agree that her parents expected her to live on her own and support herself:

    Q:     And your parents have made clear to you, your mother especially, that her
           expectation is that you will live on your [own] and support yourself?
    A:     Yes, she hates me.
    Q:     Has she made clear to you that she expects you to live on your own and support
           yourself?
    A:     Now, yes.

*LaPlante Dep.* 137:1–4. Yet in another line of questioning, it appears that her parents did not expect her to live on her own:

    Q:     When you left college . . . isn't it true that your mom made clear to you that her
           expectation was that if you weren't in school you would be living as an adult or
           supporting yourself and living on your own?
    A:     No.
    Q:     No? She didn't make that clear?
    A:     No, she's been saying that—well, it depends on how you look at that because
           since high school it's always get a life, get a job, get out of my face, so it's just
           something she's always said.
    . . .
    Q:     And you understood that you were not welcome to move back in with them?
    A:     No, I didn't understand that.

*Id.* 137:23–138:18. As far as the Court can tell from her testimony, Ms. LaPlante in the past felt like she was welcome home, but that her parents expected her to "get a life" and "get a job." *Id.* 138:6. Now, however, it appears that Ms. LaPlante understands that her parents expect her to live on her own and support herself. *See LaPlante Dep.* 137:1–4. Based on this understanding, the Court omits Peerless' proposed statement that Ms. LaPlante's parents expected her to live on her own "since high school." DSMF ¶ 41.

never at any time considered herself a member of either or both of her parents' households.  DSMF ¶ 43; PRDSMF ¶ 43.

Ms. LaPlante's parents concur that at no time since high school has Ms. LaPlante ever expressed any intention to move to their home permanently; her father describes her stays as "pit stops" and believes that Ms. LaPlante and her parents share an understanding that her stays with them have all been temporary.  DSMF ¶ 44; PRDSMF ¶ 44.  Ms. LaPlante's father considers her assertion that she was a member of their household as of the date of the Accident to be "a lie," and her mother characterizes her suit to obtain insurance coverage on the ground that she was a member of their household as "fraud."[36]  DSMF ¶ 44; PRDSMF ¶ 44.

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is "material" if it "has the potential to

---

[36]    Ms. LaPlante qualifies this statement.  PRDSMF ¶ 45.  She argues that it is clear from the context of her parents' testimony that they were "saying that [Ms. LaPlante] was never on [their] insurance policies," not that Ms. LaPlante was not a member of their household.  Upon review, the Court disagrees with Ms. LaPlante's characterization of her parents' testimony.  For instance, her father's deposition contains the following question and response:

  Q:    What was your reaction to learning that your daughter was asserting in this litigation that she was a member of your household at the time of her accident in January of 2010?
  A:    It was a lie.  She was never on my insurance policies and she never—never allowed to live there for long periods of time.  And what I recall saying to her is basically it's fraud and I'm not going to have any part of it is what I told her and she knows this.  She knows it's not true.  I can look you right in the eye and say it.

DSMF, Attach. 3, *Dep. of Michael LaPlante* 39:11–21 (ECF No. 44) (*Michael LaPlante Dep.*); *see also Robin LaPlante Dep.* 3:15–20 (characterizing Ms. LaPlante's lawsuit as "fraud").  The Court concludes that Peerless' proposed statement accurately characterizes of the testimony of Ms. LaPlante's parents, and therefore, the Court rejects Ms. LaPlante's qualification.

change the outcome of the suit." *Tropigas*, 637 F.3d at 56 (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)). A dispute is "genuine" if "a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

Once this evidence is supplied by the moving party, the nonmovant must "produce 'specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (quoting *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994)). In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)). The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011). However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan*, 267 F.3d at 27); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

Ms. LaPlante asserts—and Peerless does not dispute—that Maine law applies in this case. *Pl.'s Opp'n* at 1. In Maine, the issue of whether an individual is a resident of a household is a question of fact, but where the facts are not in dispute, the issue becomes a question of law for the court. *See Foley v. Hanover Ins. Co.*, No.

CV-98-337, 1999 Me. Super. LEXIS 235, at *3–4 (Aug. 20, 1999) (holding that the plaintiff was entitled to summary judgment as to whether she was a resident of her parents' household where the facts were not in dispute).

## IV.    DISCUSSION

### A.    Defining "Resident of . . . Household"

The sole question before the Court is whether Ms. LaPlante was a "resident" of her parents' household at the time of the Accident.  Peerless acknowledges that if Ms. LaPlante was a resident of their household, then coverage would be available to her under the policy.  *Def.'s Mot.* at 8.

#### 1.    Maine Caselaw

The Maine Supreme Judicial Court has provided guidance on this question in *Cambridge Mutual Fire Insurance Company v. Vallee*, 687 A.2d 956 (1996), and *Dechert v. Maine Insurance Guarantee Association*, 711 A.2d 1290 (1998).  In *Vallee*, an insurance company filed a complaint seeking declaratory judgment that the defendant was not covered under his father's homeowner's insurance policy.  687 A.2d at 956.  As in this case, the policy in *Vallee* defined "insured" to include relatives who were "residents" of the policyholder's household.  *Id.* at 957.  The defendant in *Vallee* had a home with his wife in Lisbon, Maine.  *Id.*  However, almost one month before the events leading to the insurance claim arose, the defendant was arrested and charged with assaulting his wife, and a condition of his bail prohibited him from returning to their home in Lisbon.  *Id.*  Consequently, for the month leading up to the events giving rise to the insurance claim, the defendant lived with his parents.  *Id.*

He kept his clothes at his parents' home and returned there each day after work. *Id.* He intended to live there until the assault charge was resolved. *Id.*

In determining whether the defendant was a resident of his parents' household for purposes of the insurance contract, the Law Court first noted that the term "resident" is ambiguous. *Id.* The *Vallee* Court observed that "residence" has "different shades of meaning depending on the context in which it is used." *Id.* (citing *Jamestown Mut. Ins. Co. v. Nationwide Mut. Ins. Co.*, 266 N.C. 430, 146 S.E.2d 410, 414 (1966) (the words "resident," "residing," and "residence" have no precise, fixed meaning applicable to all cases)). The Law Court further noted that the homeowner's insurance policy provided no clarification about the meaning of the term. *Id.* The Court explained that "[i]t is well established that ambiguities in an insurance policy are resolved against the insurer, and that a liability insurance policy must be construed to resolve all ambiguities in favor of coverage." *Id.*

Construing the term "resident" in favor of coverage," the Law Court concluded that the defendant was a resident of his parent's household for purposes of the insurance contract. *Id.* The Court held that the "temporary nature" of the defendant's stay at his parents' home did not preclude residence, and that as a result of the bail condition, he intended to reside with his parents until the criminal charge against him was resolved. *Id.*

The Maine Supreme Judicial Court addressed the meaning of "resident" of a household again in *Dechert*. 711 A.2d 1290. In that case, the plaintiff's father obtained homeowner's insurance for the family's primary residence as well as a

trailer home located a few miles away. *Id.* at 1291. Several months before the accident giving rise to the insurance claim, the plaintiff moved back into his parents' primary residence after separating from his wife. *Id.* After living with his parents for a few months, the plaintiff moved into the trailer home so that his two sons could live with him over the summer. *Id.* The plaintiff did not pay rent, but he was responsible for buying his own food and paying for utilities. *Id.* Although the plaintiff had a job, his parents helped him financially by occasionally paying for utilities and helping him purchase a car. *Id.*

In deciding whether the plaintiff was a "resident" of his parents' household for purpose of insurance coverage, the Court again noted that the term "resident" was ambiguous. *Id.* (citing *Workman v. Detroit Auto Inter-Ins. Exch.*, 404, Mich. 477, 274 N.W.2d 373, 379 (1979) ("resident of an insured's household" has no absolute meaning and may vary according to circumstances)). The Court explained that "[b]ecause we find the words ambiguous in the circumstances of this case and because they are words of inclusion of persons covered, we interpret the words liberally to the extent they can reasonably provide coverage . . . ." *Id.*

The *Dechert* Court indicated that determining whether an individual is a "resident" of a household is "fact specific," and it cited decisions from other jurisdictions to highlight that the determination turns on the particularized circumstances of each case. *Id.* (citing *Brown v. Trahan*, 526 So.2d 1216 (La. Ct. App. 1988) (finding no residency); *Row v. United Servs. Auto Ass'n*, 474 So.2d 348 (Fla. Ct. App. 1985) (finding residency)). As a general matter, the Law Court explained that

a temporary absence does not necessarily terminate the status of residency in a household and that "much will depend on the subjective or declared intent of the individual." *Id.* Before remanding the case for further factual inquiry, the Court identified a number of factors that would be relevant in determining residence given the facts of the case:

> When, if ever, [the plaintiff] ceased to be a resident in the household depends on a factual determination influenced by such questions as: What was [the plaintiff's] subjective or declared intent when he moved to the trailer? What was the nature of his tenancy? What, if any, belongings did [the plaintiff] leave with his parents? What was [the plaintiff's] practice in regard to returning home? Did [the plaintiff] retain a key? What was the extent of [the plaintiff's] financial dependency on his parents?

*Id.* The Court clarified that "[n]o one factor is, in itself, determinative; instead, each factor must be balanced and weighed with the others." *Id.*

In sum, both *Vallee* and *Dechert* teach that the term "resident of [a] household," without more, is ambiguous in the context of insurance policies, and therefore, the term should be construed liberally in favor of coverage. *Vallee*, 687 A.2d at 957; *Dechert*, 711 A.2d at 1291; *see Me. Bonding & Cas. Co. v. Grant*, CV-98-106, 1999 Me. Super. LEXIS 170, at *3 (Me. Super. June 18, 1999). Moreover, *Dechert* instructs that determining whether an individual is a resident of a household is a "fact specific" inquiry that turns on the totality of circumstances in each case. 711 A.2d at 1291. *Vallee* demonstrates that even a temporary stay can be sufficient to establish residence in a household, 687 A.2d at 957, while *Dechert* establishes that temporary absences from the home do not terminate residence. *Dechert*, 711 A.2d at 1291. Both cases make clear that the subjective intent of the party seeking coverage

is a primary factor in deciding residence. *Vallee*, 687 A.2d at 957; *Dechert*, 711 A.2d at 1291.

## 2. Additional Factors in Determining Residence

Like Maine, other states also employ a "fact specific" analysis to determine whether an individual is a resident of a household. Although the cases from these jurisdictions are not binding on this Court, they highlight some additional factors to guide the Court's residency determination.

For instance, the approach in Massachusetts closely resembles the "fact specific" approach in Maine. In Massachusetts, "determining whether someone is a member of a 'household' must 'proceed on a case-by-base basis with an evaluation and balancing of all relevant factors.'" *Metro. Prop. & Cas. Ins. Co. v. Morel*, 60 Mass. App. Ct. 379, 382 (2004) (citing *Vaiarella v. Hanover Ins. Co.*, 409 Mass. 523, 527, 567 N.E.2d 916 (1991)). These nonexclusive factors include "whether the putative member of the household has an established connection to it; whether he receives mail at that address; whether he keeps possessions there; and whether his relationship to other household members involves financial support." *Id.* at 383.

Peerless also directs the Court to caselaw from Arizona and Rhode Island. *Def.'s Mot.* at 8–9 (citing *Mendota Ins. Co. v. Gallegos*, 302 P.3d 651 (Ariz. App. 2013); *Blanchard v. Peerless Ins. Co.*, 958 F.2d 483 (1st Cir.) (interpreting Rhode Island law)). The Court is cognizant that the understanding of "residence" in these states is somewhat narrower than in Maine. For instance, in Arizona, residency in a household "contemplates a settled or permanent status . . . Thus, a relative who lives

in a home only on a temporary basis does not become a member of the household."

*Gallegos*, 302 P.3d at 655. In Rhode Island, determining whether a person is a resident of a household requires the court to consider:

> whether in the totality of the circumstances that person maintains a physical presence in the household *with intent to remain for more than a mere transitory period*, or that person has a reasonably recent history of physical presence together with circumstances that manifest an intent to return to the residence within a reasonably foreseeable period.

*Blanchard*, 958 F.2d at 486. By contrast, *Vallee* makes clear that even a temporary stay can establish residency under Maine law. 687 A.2d at 957. Nevertheless, the Court concludes that the factors identified in these jurisdictions are still instructive and provide this Court with guidance in determining whether, viewed liberally in favor of coverage, the facts of the case indicate that Ms. LaPlante was a resident of her parents' household at the time of the Accident.

Such additional relevant factors include (1) the individual's age and legal status (e.g., minor, emancipated minor, adult); (2) the individual's marital status; (3) the duration of the individual's physical presence in, or absence from, the parental home on the date of the incident giving rise to the insurance claim; (4) the reasons or circumstances explaining their presence or absence; (5) the subjective intent of the individual; (6) the existence of a second place of lodging; (7) the individual's use of the parental home address on important personal documentation; (8) the individual's receipt of mail at the parental home; (9) the individual's retention of a bedroom at the parental home; (10) the individual's storage of personal belongings at the parental home; (11) the nature of the individual's continuing activities while in the parental

home; (12) the frequency of the individual's overnight visits to the parental home; and (13) the extent of the individual's financial dependence on the parents. *See Gallegos*, 302 P.3d at 655; *Blanchard*, 958 F.2d at 486 n.3.

## B.    Application

In accordance with the familiar summary judgment praxis, the Court has viewed the facts of the case in the light most favorable to Ms. LaPlante consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002) (citing *C.K. Smith & Co. v. Motiva Enters.,* 269 F.3d 70, 72 (1st Cir. 2001)). The Court, having applied these facts to the factors set forth above, and having construed the term "resident" liberally in favor of coverage, nevertheless concludes that Ms. LaPlante was not a resident of her parents' household at the time of the Accident.

To begin, the Court notes that in the decade between her high school graduation in 2000 and the Accident in 2010, Ms. LaPlante only lived with her parents on two occasions. First, she lived with her father in an apartment in Waterville and visited her mother in North Carolina for an unknown number of months between October 2002 and September 2003. DSMF ¶ 8; PRDSMF ¶ 8. Second, Ms. LaPlante lived with her parents in their home in Oakland, Maine, from February 2009 to May 2009. DSMF ¶ 22; PRDSMF ¶ 22. Ms. LaPlante has not identified any other stays at her parents' home of any appreciable length, and there is no evidence that Ms. LaPlante made other frequent overnight visits.[37] That said,

---

[37]      In fact, the only other reference to a visit to her parents' house appears in PRDMF ¶ 16, where Ms. LaPlante states that she visited her parents' home at some point in 2006. Ms. LaPlante also relies on her mother's testimony that Ms. LaPlante visited her parents "quite a few times." PRDSMF ¶ 5;

under Maine law, even a temporary stay can be sufficient to establish residence in a household, and a temporary absence from a household does not terminate residency. *Vallee*, 687 A.2d at 957; *Dechert*, 711 A.2d at 1291. As such, it becomes particularly important to assess Ms. LaPlante's intent between the time she left her parents' home in May 2009 and the Accident in January 2010.

In May 2009, she moved into her own apartment in Bar Harbor. DSMF ¶ 25; PRDSMF ¶ 25. She lived and worked in Bar Harbor until October 2009 and then returned to Florida. DSMF ¶ 28; PRDSMF ¶ 25. Between the time she moved to Florida and the date of the Accident in January 2010, Ms. LaPlante lived in four different locations. For the first few days, she stayed with the friend with whom she had made the trip down to Florida. PRDSMF ¶ 29. She then moved in with another friend and registered a change of address with the United States Postal Service in November 2009. DSMF ¶ 28; PRDSMF ¶ 28. Shortly thereafter, she found employment in Orlando and began living with some co-workers to be closer to work. DSMF ¶ 28, PRDSMF ¶ 28. Finally, she moved into another house to have a quieter living environment, PRDSMF ¶ 32, and registered a change of address on January 27, 2010, the day before the Accident. DSMF ¶¶ 31, 33; PRDSMF ¶¶ 31, 33. At that point, Ms. LaPlante had not lived in her parents' home for eight months. Furthermore, between Ms. LaPlante's move to Florida and the Accident, she did not return to Maine. DSMF ¶ 34; PRDSMF ¶ 34.

---

*Pl.'s Opp'n* at 4 (citing *Robin LaPlante Dep.* 5:23–6:5). Yet Ms. LaPlante offers no facts to clarify if or when any additional stays occurred.

Ms. LaPlante argues that when she left Bar Harbor for Florida in October 2009, "she did so on a whim for the purpose of being somewhere other than Maine during the winter." *Pl.'s Opp'n* at 5; *see also LaPlante Dep.* 81:14–17 ("[T]his girl said that she wanted to go down to Florida and I was like I don't want to be here in the winter, maybe I'll go too and we ended up just winging it and going"). Moreover, she points to the fact that she eventually returned to her parents' home in Maine in June 2010, six months after the Accident, as evidence that she never intended to stay in Florida. *Id.*

The Court is not persuaded. First, even assuming that Ms. LaPlante intended to return to Maine after the winter, there is no evidence that she intended to return to her parents' home and no evidence that, if she returned to Maine, she intended to become a member of her parents' household. After all, she had lived in Bar Harbor for the five months immediately preceding the move to Florida, she had only moved into her parents' home twice in the previous decade, and she was aware that her parents expected her to live on her own and that any stays at their home would only be temporary. Indeed, Ms. LaPlante testified that since the time she lived with her father in 2002–2003, she has never considered herself a member of either or both of her parents' households. DSMF ¶ 43; PRDSMF ¶ 43. Second, during her deposition, Ms. LaPlante testified that before the Accident, she was going to try to stay in Florida to live and work. DSMF ¶ 25; PRDSMF ¶ 35. Finally, the fact that she signed a one-year lease on an apartment in Florida shortly after the Accident indicates that, at the time of the Accident, she did not intend to move back to Maine at the end of the

winter. Even when viewed in the light most favorable to Ms. LaPlante, the evidence overwhelmingly demonstrates that Ms. LaPlante did not consider herself a member of her parents' household and that she did not intend to reside in her parents' household at the time of the Accident.

Additional factors also compel the Court's conclusion that Ms. LaPlante was not a resident of her parents' home at the time of the Accident. The record indicates that at the time of the Accident in 2010, Ms. LaPlante was an adult, having graduated high school in 2000. DSMF ¶ 6; PRDSMF ¶ 6. The facts indicate, and Ms. LaPlante admits, that her relationship with her parents at the time of the Accident was strained. DSMF ¶¶ 23–24, *Pl.'s Opp'n* at 7. Additionally, the record shows that Ms. LaPlante registered a change of address from Maine to Florida before the Accident. DSMF ¶¶ 31, 33; PRDSMF ¶¶ 31, 33. She also reported her address in Florida as her home address on her 2009 tax return. DSMF ¶ 30; PRDSMF ¶ 30. Although the evidence does not explicitly state whether Ms. LaPlante retained a designated bedroom in her parents' house, her parents made clear that they expected her to find a place to live, and they understood her move to Florida to be permanent. DSMF ¶ 29; PRDSMF ¶ 29; DSMF, Attach. 4, *Dep. of Robin LaPlante* 7:23–8:1 (ECF No. 44) (*Robin LaPlante Dep.*). In addition, there is evidence that her parents provided occasional financial support in the way of airline tickets and moving expenses; however, it appears that Ms. LaPlante was responsible for her own day-to-day expenses, such as food, rent, and utilities. DSMF ¶ 26; PRDSMF ¶ 26; *LaPlante Dep.* 92:14–19. Finally, there is the strong testimony from the named insureds on the

policy, namely Ms. LaPlante's parents, that they unequivocally did not consider her a resident of their household at the time of the Accident. DSMF ¶ 44; PRDSMF ¶ 44.

In her opposition to summary judgment, Ms. LaPlante describes herself as itinerant, pointing out that since graduating high school, she has been employed at twenty-eight locations in seven states. *Pl.'s Opp'n* at 6. According to Ms. LaPlante, "[t]o argue that Plaintiff intended any of the places where she lived while working at these 28 different employers in 7 different States (in less than 10 years) to become her home is nonsense." *Id.* Yet the fact that Ms. LaPlante moved frequently does not resolve the central question in this case—namely, whether Ms. LaPlante was a resident of her parents' household for purposes of her parent's motor vehicle policy at the time of the Accident. Applying the relevant factors from Maine law and elsewhere, the Court concludes that she was clearly not a resident of Michael and Robin LaPlante's household as of the date of the Accident, and therefore, she is not entitled to uninsured motorist benefits under the Policy.

## V. CONCLUSION

The Court GRANTS Peerless' Motion for Summary Judgment (ECF No. 43).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 19th day of June, 2017